Filed 4/15/14  WFP Securities v. Davis CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WFP SECURITIES, INC. et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>JAIMIE DAVIS,<br><br>    Defendant and Appellant. | B244528<br><br>(Los Angeles County<br>Super. Ct. No. BS136533) |

APPEAL from an order of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Law Offices of Melinda Jane Steuer and Melinda Jane Steuer for Defendant and Appellant.

Winget Spadafora & Schwartzberg, Brandon S. Reif, David Maurer, and Shanna Javaheri for Plaintiffs and Respondents.

_____

## INTRODUCTION

Appellant Jaimie Davis filed an arbitration against respondents WFP Securities, Inc. (WFP), John Evan Schooler, and Curtis J. Sathre, II, seeking to recover money she lost in bad investments they had recommended. The arbitration did not go well for her. The rulings by the three arbitrators who heard her claim were sometimes inconsistent, sometimes unaccompanied by an explanation, and ultimately adverse to her claims. If you bargain for and agree to arbitration, however, you get arbitration, and sometimes the kind of arbitration experience Davis had.

Davis now appeals from an order confirming the arbitration award in favor of WFP, Schooler, and Sathre, expunging all references to the arbitration from Schooler's and Sathre's records, and denying Davis' petition to vacate the award. Davis contends the award must be vacated due to erroneous exclusion of expert testimony and witness intimidation. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Arbitration*

1.    Davis' Statement of Claim

Davis initiated arbitration proceedings against respondents before the Financial Industry Regulatory Authority (FINRA).[1] WFP is a member of FINRA. Schooler is WFP's president, and Sathre is a registered representative with WFP.

In her claim, Davis alleged that she was 38 years old and invested almost her entire net worth with respondents. Respondents sold her certain investments,

---

[1]    "In 2007 the National Association of Securities Dealers, Inc. (NASD), and the member regulation, enforcement and arbitration operations of the New York Stock Exchange merged to form FINRA. [Citation.]" (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1128, fn. 2.)

representing that they were safe, income-producing investments. In fact, the investments were unsafe and fraudulent. Had respondents acted with due diligence, they would have discovered the fraud and would have disclosed that information to Davis.

Davis further alleged that respondents placed over $1 million of her money in speculative, illiquid real estate and oil and gas investments, again misrepresenting them as safe, income-producing investments. Davis retired based on respondents' false representations regarding the income these investments would produce.

Davis also alleged that respondents were negligent in recommending and selling these investments to her, violated the duties they owed to her, and were motivated by their personal financial interests. As a result, Davis lost much of the money she had invested. She sought to recover from respondents compensatory damages of more than $2 million, plus punitive damages.

### 2. Respondents' Answer

In their answer, respondents alleged that Davis had a degree in finance, was a licensed real estate broker and experienced real estate investor, and was a knowledgeable investor who represented that she was able to evaluate investment risk. She was seeking to invest in alternatives to stock, bond, and mutual fund investments, such as investments in real estate and oil and gas. A friend of Davis who was satisfied with Sathre's services referred her to Sathre. Before investing with Sathre, Davis asked questions about the investments and represented that she had read the private placement memoranda or prospectuses describing the investments. During the course of her five-year professional relationship with Sathre, Davis indicated she was satisfied with his services, often reinvested investment proceeds in products he recommended, and referred new clients to him. The relationship changed only after the global financial crisis.

Respondents further alleged that they acted with due diligence in recommending investments to Davis and that the investments were suitable. Davis acknowledged the risks involved in making these investments after reading the private placement memoranda. Problems with some of the investments only surfaced after the economy

3

suffered a financial crisis, and respondents were not responsible for that crisis. Respondents also asserted a number of affirmative defenses, including ratification, equitable defenses, and statute of limitations.

### 3. Expert Witness Douglas J. Schulz

The arbitration proceeded before a panel of three arbitrators. Two of them, Thomas R. Watkins, the chair of the panel, and Judith Porter, were public arbitrators. The third arbitrator, Gerald C. Tambe, was a non-public arbitrator.[2]

Davis listed Douglas J. Schulz as a witness on her witness list. Schulz is president of his company and provides professional money management services. According to his curriculum vitae, which Davis submitted as an exhibit, Schulz is a securities consultant who testifies regularly as an expert witness in federal and state courts. Parties retain him to testify about "rules, laws and regulations of the securities industry; norms and guidelines of brokerage firms; suitability of investments and investment strategies; order execution; evaluation of various investments; damage theories; supervision and compliance." He was previously licensed with the Securities and Exchange Commission and is currently licensed as a Registered Investment Advisor.

At an evidentiary hearing on Monday, October 3, 2011 counsel for respondents, Brandon S. Reif, noted that there had been discovery orders for the production of documents, some of which pertained to Schulz, and that Reif had not received them until the previous weekend. Reif stated that he had not had an opportunity to review the documents and wanted the arbitrators to exclude them. Counsel for Davis, William J.

---

[2]  Public arbitrators are unattached to the securities industries while non-public arbitrators have experience in the securities industry. (*STMictroelectronics, N.V. v. Credit Suisse Securities (USA) LLC* (2d. Cir. 2011) 648 F.3d 68, 72; see *Stone v. Bear, Stearns & Co., Inc.* (E.D. Pa. 2012) 872 F.Supp.2d 435, 439 ["the general gist" of the FINRA rules is that "public arbitrators should not be too closely tied to the securities industry, while non-public arbitrators should have significant securities-related experience"].)

4

Brown, Jr., explained that he had misplaced some of the documents in his office and he had not received other documents until the weekend. When Watkins asked Brown about evidence suggesting that Brown had possession of some the documents in August 2011, Brown repeated that he was unaware the documents were in his office, denied there was "some sort of sandbag," and stated that he sent them to Reif as soon as he had discovered and reviewed them.

Watkins responded that he did not think Brown was trying to sandbag anyone, but stated: "I understand Mr. Reif's concern. I understand your position with respect to how you received them and you got them over. I think that should be acceptable." Reif stated, "That's fine." Watkins continued: "So we can just move on. I don't think they were trying to do anything intentionally to cause [respondents] not to receive the documents in a timely manner according to what Mr. Brown's statement is. I think that that's acceptable. I think we can just go forward now. Whether you're ready or not, that's a choice you will make. I'm not sure how important they are to you at this point given what you have already received and other things you may have been requesting." Reif pointed out that they were not dealing with voluntary production of documents but a discovery order. Watkins stated that he wanted to move forward with the hearing, and "[i]f there's anything that we need to resolve, we'll resolve it."

At the arbitration hearing the next day, October 4, 2011, Brown questioned Schulz about his qualifications, including his education, licensing, and experience. Schulz stated that he had "testified over 600 times under oath," in arbitrations, depositions, and in court. He had "testified on . . . the gamut of investing and securities rules and regulations."

With the panel's permission, Reif conducted a voir dire examination of Schulz. Reif asked Schulz how long it had been since he worked in the brokerage industry, whether he had sold products such as those involved in the arbitration, and about his licensing and experience. Reif also questioned Schulz about his involvement in other cases, his publications, and other aspects of his professional life.

Following the voir dire examination, Reif moved to exclude Schulz as an expert on the grounds "[h]e's got no relevant experience in the area of the brokerage industry to testify as an expert in this case, his NASD licenses are outdated. He hasn't been in the retail business for over 20 years . . . ." Reif also argued that Schulz had "never been a compliance officer in the brokerage industry. He's never supervised a registered representative and he's unqualified therefore to testify about supervision." There also was no evidence Schulz "ever conducted due diligence on any of the products that are at issue here or any products that are similar to the ones at issue here. Clearly based on his prior testimony representing just the claimants and the investing public, publishing a book on how to sue brokers, he's clearly biased." Reif added that "based on the disqualifications [as an expert witness in other cases], deemed untrustworthiness and withdrawal of prior opinions in the securities industry and one of the banking industry, that he's not an expert for purposes of this case and he shouldn't be allowed to provide expert testimony in this matter."

Brown opposed the motion, noting that Schulz had been qualified as an expert in 600 cases and that "[t]he other side was able to point out [only] a handful of cases in which his opinions were explicitly not accepted or somebody tried to exclude him as a witness." In addition, Brown argued that Reif was objecting to the content of Schulz's testimony rather than his qualifications as an expert witness. Brown concluded: "This witness is clearly very qualified. He's got a great deal of expertise in this area and his opinions are going to be helpful to the triers of fact in deciding what happened in this case in determining this case. I think that this is indicative of the no holds barred approach that's been applied to every aspect of this case that we've seen so far. We've seen it throughout. I'm not the least bit surprised that we're seeing it with respect to our expert. I think that the motion should be summarily denied and we can move onto the testimony . . . ."

Following a brief recess and an "executive session" to consider the motion to exclude Schulz, the arbitration panel announced that it "unanimously decid[ed] to grant the motion." Brown disagreed with the ruling and asked the panel to reconsider because

the ruling would "throw this whole process completely off and I think it's against the principles of FINRA to do that." Watkins responded that the panel members were "not going into lengthy explanation of why we made the decision. We did that. That's why we went into executive session. We considered the things that you mentioned with respect to Ms. Davis' opportunity to put on her case in chief, as well as Respondent[s']. We always look at both sides." Watkins explained further that the panel considered how its ruling would affect both sides, but the ruling would stand and there was "nothing else we can do on this matter at this point."

Brown continued his objections, claiming the ruling was prejudicial and shocking. When Watkins said again that the ruling would stand, Brown asked: "So is it clear that the panel is not going to describe the grounds for its ruling, Mr. Chairman? We would like at least that much on the record if that's what's the case." Watkins responded, "It's not debatable. We're not writing or we're not providing a written reason or a stated reason with respect to what we decided on, otherwise, that's why I didn't give you other specific information with respect to what we were considering other than what was raised in the motion. That's it. We did give it the full consideration."

### 4. Witness Robert Phalen

Davis also listed Robert Phalen as a witness. Phalen was another customer of WFP who had lost money in similar investments and then brought an arbitration claim against WFP. Brown apparently intended to call Phalen to testify about his experiences and losses.[3] Brown reported to the arbitrators, however, that Phalen "said he's been

---

**3**     It is not clear from the record whether Brown made this offer of proof to the arbitrators. Davis' witness list included Phalen as one of 41 witnesses she intended to call but did not describe the subject matter of his testimony. The excerpt of the arbitration transcript included in appellant's appendix does not disclose why Davis wanted to call Phalen or what his testimony would be. The evidence about Phalen and his testimony is contained in the declaration Brown submitted to the trial court in support of Davis' motion to vacate the arbitration award.

threatened with litigation if he testifies and so he has told us that he's not going to come and testify in spite of the subpoena. So we'll probably move on to [another witness] in the morning." Reif responded that Phalen "has not been threatened in any way. He has a document that prohibited him from doing certain activities and he's been warned that if he violates his contract, his agreement, then yes, he could be sued. He was proceeding without counsel speaking with the adversary, but not speaking with me. So he hasn't been threatened in any manner. To that accusation, that's hearsay, self-serving and it's disputed."

### 5. The Arbitration Award

The arbitrators ruled for respondents. In their award, however, the arbitrators gave a different reason for excluding Schulz than the reason they had indicated at the hearing. At the hearing, the arbitrators granted respondents' motion to exclude Schulz as unqualified and ruled that he would "not be accepted as an expert witness in this matter." In the award, the arbitrators stated that they had "unanimously dismissed" Schulz "in accordance with FINRA Code of Arbitration Procedure . . . Rule 12212(a) for [Davis'] non-compliance with the Panel's Discovery Orders on March 16, 2011 and April 25, 2011, and the Panel's Order to produce subpoenaed documents from [Davis'] expert witness issued on July 11, 2011. The Panel found that [Davis] and Mr. Schulz obstructed the evidentiary hearings when [Davis] was non-responsive to the Panel's written warnings on June 10, 15 and 23, 2011 and July 12, 2011, and the Panel's oral warnings at the hearing on July 18, 2011 and October 3, 2011. [Davis'] non-compliance prejudiced Respondents' preparation of their case-in-chief."[4] The arbitration award did not mention Phalen.

On the merits of Davis' claim, "[t]he Panel found that [Davis] ultimately asserted the following causes of action: 1) failure to treat [Davis] in a just and equitable manner;

---

**4** The arbitrators probably meant that respondents were prejudiced in the preparation of their defense, not their case-in-chief, because Schulz was a witness for Davis.

2) breach of contract; 3) breach of fiduciary duty; 4) negligence, negligent misrepresentations, and omissions; 5) violation of California Corporations Code; 6) control person liability; 7) failure to supervise; and 8) unsuitable investments. These allegations and the causes of action alleged in [Davis'] Statement of Claim emanate from [Davis'] investment in products covered by Regulation D and other private placement programs. [Davis] brought this arbitration to recover losses she suffered as a result of Respondents' alleged misconduct associated with the recommendations and sales of alleged fraudulent investment products that are alleged to have been Ponzi schemes. The Panel unanimously found that [Davis] failed to prove by a preponderance of [the] evidence any of the causes of action[] or allegations alleged in the Statement of Claim. Therefore, [Davis'] Statement of Claim is dismissed in its entirety." The arbitrators also found that "[u]nder any of these potentially applicable statutes of limitations, [Davis'] claims are barred as a matter of law." Finally, the arbitrators found that Davis had filed duplicative claims in other forums, and it was "highly likely" that she was seeking double recovery on her claims. Her "actions protracted the FINRA Dispute Resolution arbitration proceedings and enhanced the costs and fees of Respondents. [Her] actions are in direct violation of FINRA Code Rule 12209."

The arbitrators ordered Davis to pay respondents $135,755.89 for costs and expert witness fees. They also split the arbitration fees of just over $42,000 approximately evenly between Davis and respondents.

B. *The Petitions To Confirm and Vacate*

1. The Petitions

Respondents filed a petition to confirm the arbitration award, and Davis filed a petition to vacate it. (See Code Civ. Proc., §§ 1285, 1286.2.)[5] Of the six grounds listed

_____

[5] All further section references are to the Code of Civil Procedure unless otherwise stated.

9

in section 1286.2, subdivision (a),[6] Davis based her petition to vacate the award on the first and fifth grounds: that respondents procured the award "by corruption, fraud, or other undue means" (§ 1286.2, subd. (a)(1)) and that the arbitrators refused "to hear evidence material to the controversy" (§ 1286.2, subd. (a)(5)). Davis claimed the award should be vacated based on the arbitrators' exclusion of Schulz's testimony and "because WFP prevented the testimony of a crucial impeachment witness through threats and intimidation."

Davis submitted a declaration by her new attorney, Melinda Jane Steuer, attaching as an exhibit a "rough outline" of what Schulz's testimony at the arbitration would have been. Respondents filed evidentiary objections to Steuer's declaration and the attached exhibit. Respondents also noted that "[t]he outline reads as a series of random references to citations, argument and statements by the author which, incidentally, purport to weigh testimony . . . . At bottom, this outline, as entertaining as it is—is not a substitute for a properly authenticated and admissible declaration under penalty of perjury." (Emphasis omitted.)

---

[6] Section 1286.2, subdivision (a), provides that "the court shall vacate the award if the court determines any of the following:
    "(1) The award was procured by corruption, fraud or other undue means.
    "(2) There was corruption in any of the arbitrators.
    "(3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator.
    "(4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted.
    "(5) The rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title.
    "(6) An arbitrator making the award either: (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware; or (B) was subject to disqualification upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision. . . ."

Davis also submitted a declaration from Phalen. Phalen stated that he had invested with Sathre and WFP and had subsequently learned that many of the companies he invested in were Ponzi schemes and scams. He had filed a civil suit and an arbitration proceeding against WFP, which were resolved in a settlement agreement with a confidentiality provision.

Phalen stated that he received a subpoena to testify in Davis' arbitration and that Brown subsequently contacted him about testifying. Brown "explained [to Phalen] that it would be a great help to Ms. Davis' case if I would testify as a witness and describe my interactions with Mr. Sathre and WFP Securities Inc. without mentioning anything about [my] case's resolution." Phalen contacted his attorney, Robert A. Uhl, and "learned that Mr. Sathre and WFP Securities Inc., through their counsel, had threatened to sue me if I testified in Ms. Davis' case." Phalen then contacted Brown, who said "he had heard the same threat directly from counsel for Mr. Sathre and WFP Securities Inc." and that counsel for WFP "had threatened to take action against him as well as against me for calling me as a witness." Phalen "reluctantly gave in to the intimidation" and declined to testify for Davis.

Brown stated in his declaration that he had intended to call Phalen to testify about "his experience as a customer of WFP; his interaction with the respondents in the WFP arbitration; representations that had been made to him by respondents; the investments he made and the losses he suffered; and the claims he had made and settled with WFP." Phalen initially told Brown that he would testify at the arbitration and later said that even though his attorney had instructed him not to appear he was going to appear anyway, "because he felt strongly about testifying in support of Ms. Davis." The day before he was scheduled to testify, however, Phalen told Brown that he would not testify because Reif had told him that if he "appeared at the hearing and testified [he] would be sued by WFP regardless of what [his] testimony was." Brown also stated that, during a break in the arbitration proceedings, he spoke with Reif about "whether there was an agreement we could reach on the scope or confidentiality of Mr. Phalen's testimony so that Mr. Phalen could testify without threat of a suit from respondents. Mr. Reif stated that based

11

on the settlement agreement between his clients and Mr. Phalen that Mr. Phalen would be subject to suit if he appeared. Mr. Reif stated that he believed that Mr. Phalen merely discussing with me the possibility of complying with the FINRA subpoena to testify was probably already basis for a suit and that Mr. Reif's clients fully intended to sue Mr. Phalen."

Reif stated in his declaration in opposition to Davis' petition to vacate the arbitration award that he sent a letter to Uhl regarding the "Confidentiality and Non-Disparagement" provisions of Phalen's settlement agreement with WFP. Reif never spoke directly to Phalen on Uhl's instructions. Reif also advised Brown that he would recommend that respondents enforce the provisions of the confidential settlement agreement. Reif did not believe that Brown had any personal knowledge of the terms of that settlement agreement. Reif added that Brown never asked the arbitration panel to issue an order compelling Phalen to testify.

## 2. The Rulings on the Petitions

At the hearing on the petitions to confirm and vacate, Steuer stressed that the panel did not inform Davis and her attorney at the arbitration hearing of the reason the panel excluded Schulz. Steuer also pointed out that at the arbitration hearing the previous day the panel apparently had accepted Brown's explanation for the late production of documents and suggested that Davis had cured the discovery violations. Steuer argued that Davis therefore had no reason to believe there was any issue about the production of documents. Steuer also argued that Schulz's testimony was material and its exclusion prejudicial, because Davis could not prove professional negligence without expert testimony. Reif responded that because "there was no proffer made for what [Schulz] would have said," "[t]here cannot be an argument that anything he would have said would be material." Reif also told the court that Schulz had refused to comply with a document subpoena. When Schulz did comply, he only produced a "small sample" of the documents subpoenaed.

12

With respect to Phalen, Steuer argued that "[t]he fact that he still could have testified . . . under an asserted privilege does not change the fact that he was basically intimidated into [not] testifying which is unlawful conduct." She added that "[h]aving somebody else who can come in [as] an investor with the same broker and say he told me it was safe[, h]e told me there were no risks is really powerful and it's really important." Reif responded that Phalen was bound by confidentiality agreements and that "there was no intimidation or coercion. There was a contract that he had to abide by and it did not prohibit him from testifying. . . . It prohibited him from breaching confidentiality and disparaging the people that signed the agreements . . . . If Mr. [Phalen's] testimony was so critical . . . the underlying counsel for Ms. Davis should have presented him at the hearing, let him say I cannot answer these questions unless there's an order from the panel. Then there's an order and then he's not subject to suit for any breach of confidentiality or non-disparagement."

The trial court granted respondents' petition to confirm the award and denied Davis' petition to vacate it, although the court confused the grounds of Davis' petition. The court erroneously stated that Davis was relying on the third ground for vacating an arbitration award, substantial prejudice by misconduct of the arbitrators affecting her substantial rights pursuant to subdivision (a)(3) of section 1286.2, when Davis' petition actually stated that she was seeking to vacate the arbitration award based on the first and fifth grounds that the award was obtained "by corruption, fraud or other undue means" (§ 1286.2, subd. (a)(1)) with respect to Phalen and that the arbitrators failed to hear evidence (§ 1286.2, subd. (a)(5)) with respect to Schulz. The court then found that the third "ground is insufficient because: the determination of an expert's qualifications is within the powers of the arbitral panel; [Davis] was not precluded from calling another expert; and the arbitral panel, in any event, found in favor of [respondents] on other grounds too, including that [Davis'] claims were barred by applicable statute of limitations."

With respect to the first ground of section 1286.2, subdivision (a), that the award was procured by fraud or undue means (§ 1286.2, subd. (a)(1)) based on Phalen's refusal

13

to testify, the trial court noted that Davis did not claim that the arbitral panel was guilty of corruption, fraud, or misconduct. The court also found that Phalen "could nonetheless have testified under an asserted privilege." The court stated that, in any event, his testimony "would only be offered to corroborate [Davis'] own testimony of improper conduct by WFP personnel. The arbitral panel did consider [Davis'] evidence of such improper conduct and ruled against [her]. The arbitral panel, furthermore, gave two independent grounds for their decision that were not influenced by the disputed evidence as to WFP's alleged improper conduct." The court concluded that "in applying the code sections that are applicable to the proceeding to confirm an arbitration award, I do not find a basis to set aside or modify this particular arbitration award."

## DISCUSSION

As she argued in the trial court, Davis argues on appeal that the arbitration award must be vacated pursuant to section 1286.2, subdivision (a)(5), because the arbitrators refused to hear material evidence in the form of testimony by Schultz, and section 1286.2, subdivision (a)(1), because respondents procured the award "by corruption, fraud or other undue means" by intimidating Phalen and dissuading him from testifying. We conclude that Davis has not shown that the arbitration award should be vacated on either ground.

A.      *Standard of Review*

When parties submit to binding arbitration, they intend the arbitrators' award to be binding and final. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 380; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 8-11.) As the trial court observed, review of arbitration awards is extremely narrow. (*Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 33; *Gray v. Chiu* (2013) 212 Cal.App.4th 1355, 1362.) The arbitrators' decision is not reviewable for errors of fact or law. (*Moncharsch*, *supra*, at p. 11; *Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 354.) We "may not review the merits

14

of the underlying controversy or the arbitrator's reasoning, even when an error of law is apparent on the face of the award and causes substantial injustice. [Citations.]" (*Burlage v. Superior Court* (2009) 178 Cal.App.4th 524, 529; accord, *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1355; *Mave Enterprises, Inc. v. Travelers Indemnity Co.* (2013) 219 Cal.App.4th 1408, 1430.)

We independently review the trial court's order granting or denying a petition to vacate an arbitration award. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9; *Anaheim Union High School Dist. v. American Federation of State, etc.* (2013) 222 Cal.App.4th 887, 890, petn. for review pending, petn. filed Feb. 14, 2014.) But we "apply the substantial evidence standard to the extent the trial court's ruling rests upon a determination of disputed factual issues. [Citations.]" (*Burlage v. Superior Court, supra,* 178 Cal.App.4th at p. 529; *SWAB Financial, LLC v. E\*Trade Securities, LLC* (2007) 150 Cal.App.4th 1181, 1196.) We accord every reasonable intendment to an arbitration award. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 9; see *Ikerd v. Warren T. Merrill & Sons* (1992) 9 Cal.App.4th 1833, 1841 ["[o]ur review of an arbitration award requires us to extend to it every intendment of validity and the party claiming error has the burden of supporting his contention"].) The party seeking to vacate an arbitration award has the burden of showing that one of the six grounds listed in section 1286.2, subdivision (a), applies and that the party was prejudiced by the alleged grounds for vacating the award. (See *Comerica Bank v. Howsam* (2012) 208 Cal.App.4th 790, 826; *Lopes v. Millsap* (1992) 6 Cal.App.4th 1679, 1685.)

B. *The Exclusion of Schulz's Testimony Does Not Require Vacating the Arbitration Award Under Section 1286.2, Subdivision (a)(5)*

Even though respondents made a motion at the arbitration to exclude Schulz because he lacked qualification to testify as an expert, and the arbitrators granted that motion at the hearing, Davis does not argue that the arbitrators excluded Schulz because he lacked qualifications or that the arbitrators erred in making such a ruling. Indeed, Davis states that because the arbitrators excluded Schulz's testimony as a discovery

15

sanction, his "qualifications, and/or the panel's right to determine them, are not at issue . . . ."**7** Davis contends that "the dispositive questions here are: 1) was Mr. Schulz's testimony material; and 2) was the exclusion of Mr. Schulz's testimony prejudicial?" In Davis' view, because Schulz's testimony would have been material and necessary to prove her case, its exclusion was necessarily prejudicial and the trial court erred in refusing to vacate the arbitration award.

The fact that arbitrators erroneously exclude evidence, however, does not automatically mean that the losing party has a basis for vacating an arbitration award. As the court explained in *Burlage v. Superior Court*, *supra*, 178 Cal.App.4th at page 529, inherent in the arbitrators' power to decide all factual and legal questions raised in the arbitration "'is the possibility the arbitrator may err in deciding some aspect of the case. Arbitrators do not ordinarily exceed their contractually created powers simply by reaching an erroneous conclusion on a contested issue of law or fact . . . ,' and awards may not be vacated due to such error because '"[t]he arbitrator's resolution of these issues is what the parties bargained for . . . ."'" [Citations.] 'When parties opt for the forum of arbitration they agree to be bound by the decision of that forum knowing that arbitrators, like judges, are fallible.' [Citation.] [¶] But tolerance for fallibility has its limits. Section 1286.2, subdivision (a)(5) provides that a court 'shall' vacate an award when a party's rights 'were substantially prejudiced . . . by the refusal of the arbitrator [] to hear evidence material to the controversy . . . .' This section has been interpreted as 'a safety valve in private arbitration that permits a court to intercede when an arbitrator has prevented a party from fairly presenting its case.' [Citation.]"

---

**7**     Because Davis states that there is no issue on appeal with respect to Schulz's qualifications or the panel's right to determine them, she has forfeited any claim that the award should be vacated because the arbitrators erroneously excluded Schulz for lack of qualifications to testify as an expert. (See *Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 451, fn. 4; *Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1231.)

16

"Typically, a trial court reviewing a ruling excluding evidence first resolves any dispute over materiality and then considers whether excluding material evidence caused substantial prejudice. Under *Moncharsh* [*v. Heily & Blase*, *supra*, 3 Cal.4th at page 11], 'it is the general rule that, with narrow exceptions, an arbitrator's decision cannot be reviewed for errors of fact or law.' . . . Subdivision [(a)(5)] of section 1286.2, applied in the usual two-step manner, would often permit a court to second-guess an arbitrator's legal theory if materiality hinged on the validity of the arbitrator's differing view of the law. If an arbitrator excluded evidence as immaterial, a reviewing superior court could examine the arbitrator's theory of the case while analyzing the materiality of evidence the arbitrator excluded. [¶] . . . In the typical arbitration, an arbitrator must make numerous decisions about admission of evidence and in doing so may exclude material evidence. No doubt there will often be aggrieved parties who believe they have been 'substantially prejudiced.' Decisions about materiality cannot be made without familiarity with the issues and evidence in the arbitration. If the superior court must, with or without a transcript of the arbitration, routinely review the arbitrator's decision on materiality before reaching the question of substantial prejudice, the legislative goal of arbitral finality will be unattainable. Instead of saving time and money, the arbitration will be supplemented by lengthy and costly judicial second-guessing of the arbitrator." (*Hall v. Superior Court* (1993) 18 Cal.App.4th 427, 438.) The court in *Hall* rejected "the suggestion . . . that section 1286.2, subdivision [(a)(5)], provides a back door to *Moncharsh* through which parties may routinely test the legal theories of arbitrators." (*Hall*, *supra*, at pp. 438-439; see *Schlessinger v. Rosenfeld, Meyer & Sussman* (1995) 40 Cal.App.4th 1096, 1110 [the "contention . . . that the arbitrator did not permit [a party] to offer material evidence . . . could be made in virtually every case where the arbitrator has excluded some evidence or placed limitations on discovery," and "this type of attack on the arbitrator's decision, if not properly limited, could swallow the rule that arbitration awards are generally not reviewable on the merits"].) Rather, the subdivision only "permits a court to intercede when an arbitrator has prevented a party from fairly

17

presenting its case." (*Hall*, *supra*, at p. 439; accord, *SWAB Financial, LLC v. E\*Trade Securities*, LLC, *supra*, 150 Cal.App.4th at p. 1196.)

We agree with Davis that expert testimony is generally required to prove a claim of professional negligence. (See *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1239 ["as a general rule the standard of care against which the professional's acts are measured remains a matter peculiarly within the knowledge of experts," and "[o]nly their testimony can prove it"]; accord, *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001; *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 741). We also agree that erroneous exclusion of "*all* evidence relating to a claim, or *essential* expert testimony without which a claim cannot be proven" is generally prejudicial. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1115, italics added; see *People ex rel. Dept. of Transportation v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1086 ["'[i]t is prejudicial error to exclude relevant and material expert evidence where a proper foundation for it has been laid, and the proffered testimony is within the proper scope of expert opinion'"]).

Nevertheless, arbitrators have the authority to exclude evidence, including testimony by expert witnesses, for discovery violations, under the Code of Civil Procedure and the FINRA Code of Arbitration Procedure for Customer Disputes. Section 1283.05, subdivision (b), provides that arbitrators "have power, in addition to the power of determining the merits of the arbitration, to enforce the rights, remedies, procedures, duties, liabilities, and obligations of discovery by the imposition of the same terms, conditions, consequences, liabilities, sanctions, and penalties as can be or may be imposed in like circumstances in a civil action by a superior court of this state under the provisions of this code, except the power to order the arrest or imprisonment of a person." (See *Berglund v. Arthroscopic & Laser Surgery Center of San Diego, L.P.* (2008) 44 Cal.4th 528, 535 ["[s]ection 1283.05's subdivision (b) grants arbitrators the power to enforce discovery through sanctions," and "[t]hus, in an arbitration proceeding the arbitrator's power to enforce discovery resembles that of a judge in a civil action in superior court"]; *Alexander v. Blue Cross of California* (2001) 88 Cal.App.4th 1082,

18

1091 [section 1283.05 grants power to an arbitrator to impose discovery sanctions]; accord, *Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 923.) Superior court judges have the authority in appropriate circumstances to exclude expert testimony as a discovery sanction. (See *Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 952 [court may exclude expert opinion for unreasonable failure to produce expert reports and writings]; *Waicis v. Superior Court* (1990) 226 Cal.App.3d 283, 287 [trial court had discretion to preclude testimony of expert who "was not cooperating with discovery"].) Similarly, the FINRA arbitration rules, to which the parties agreed to be bound, permit the arbitrators to "[p]reclud[e] a party from presenting evidence" for failure to comply with "any order of the panel . . . ." (FINRA rule 12212(a).) The FINRA rules also specifically authorize discovery sanctions for "[f]ailure to cooperate in the exchange of documents and information . . ." and "[f]ailing to comply with the discovery provisions of the Code [of Arbitration Procedure for Customer Disputes] . . . ." (FINRA rule 12511(a).)[8]

Here, the arbitrators stated in the arbitration award that they excluded Schulz's testimony as a discovery sanction. The arbitrators found that Davis and Schulz deliberately failed to comply with the panel's orders and that their "non-compliance prejudiced" respondents. Davis does not argue that the arbitrators' discovery sanction was incorrect or inappropriate, nor does Davis include in the record the discovery orders and violations that were the basis of the discovery sanction. Davis' mere disagreement with the arbitrators' discovery ruling is an insufficient basis for vacating the arbitration award. (*Hall v. Superior Court*, *supra*, 18 Cal.App.4th at pp. 438-439; see *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 164 [under section 1283.05,

---

**8** We grant Davis' request for judicial notice of FINRA rule 12212 and take judicial notice under Evidence Code sections 452, subdivision (h), and 459 of FINRA rule 12511. FINRA rule 12409, of which we have taken judicial notice at respondents' request, provides that "[t]he panel has the authority to interpret and determine the applicability of all provisions under the Code. Such interpretations are final and binding upon the parties."

"arbitrators have great latitude and discretion when ruling on discovery matters"].)**9** The propriety of the arbitrators' decision to impose a discovery sanction is not subject to judicial review. (See *Bak v. MCL Financial Group, Inc.* (2009) 170 Cal.App.4th 1118, 1124 [FINRA rules permit arbitrators to make decisions and take action regarding discovery, and their decisions and actions are final and binding on the parties]; *Alexander v. Blue Cross of California*, *supra*, 88 Cal.App.4th at p. 1089 [erroneous discovery order does not exceed arbitrators' powers under section 1286.2, subdivision (a)(4)].)**10**

Davis asserts that the arbitrators' exclusion of Schulz's testimony for discovery violations, without notice and an opportunity to cure, was improper. She focuses on the arbitrators' failure to state at the hearing why they were excluding Schulz's testimony after Watkins had made statements the previous day that he did not think the conduct of counsel for Davis in producing documents over the weekend was intentional and that the parties could proceed with the arbitration. Davis argues that Watkins' statements misled her into believing there was no discovery issue. She does not point to anything in the

---

**9** None of the cases Davis cites with respect to the exclusion of Schulz's testimony involved a discovery sanction imposed in an arbitration proceeding. (See *Sole Energy Co. v. Hodges* (2005) 128 Cal.App.4th 199, 207; *Newland v. Superior Court* (1995) 40 Cal.App.4th 608, 610; *Thomas v. Luong* (1986) 187 Cal.App.3d 76, 80-81; *Alliance Bank v. Murray* (1984) 161 Cal.App.3d 1, 5; *Morgan v. Ransom* (1979) 95 Cal.App.3d 664, 670; *Caryl Richards, Inc. v. Superior Court* (1961) 188 Cal.App.2d 300, 305.)

**10** Thus, this is not a case, like the cases from other jurisdictions cited by Davis, where the arbitrators simply refused to hear evidence material to the controversy. (See, e.g., *Bordonaro v. Merrill Lynch, Pierce, Fenner & Smith* (2004) 156 Ohio App.3d 358, 367 [805 N.E.2d 1138, 1144] [arbitrators excluded expert testimony regarding the standard of care for a securities broker and the suitability of investments, apparently not believing such testimony was admissible or necessary]; cf. *Unigard Ins. Group v. O'Flaherty & Belgum*, *supra*, 38 Cal.App.4th at p. 1239 [erroneous determination that as a matter of law the defendant met the standard of care prevented the plaintiff from introducing expert testimony regarding the defendant's professional negligence]; *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.* (9th Cir. 1986) 803 F.2d 454, 461 [trial court erroneously excluded testimony by the plaintiff's expert on the rules of the New York Stock Exchange and National Association of Securities Dealers due to confusion about whether they were a proper subject for expert testimony].)

20

FINRA rules or the arbitration agreement, however, that required the arbitrators to explain their evidentiary rulings at the time they make them. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 107 [under section 1283.4, and in cases not involving FEHA or other unwaivable statutory rights, arbitrators need not make express findings on each issue]; *Sapp v. Barenfeld* (1949) 34 Cal.2d 515, 522 ["'[t]here is no general rule that arbitrators must find facts and give reasons for their awards,'" and "'[i]n fact, the rule and general practice is to the contrary'"].) FINRA rule 12604(a), of which we take judicial notice pursuant to Evidence Code sections 452, subdivision (h), and 459 states only that "[t]he panel will decide what evidence to admit," and that "[t]he panel is not required to follow state or federal rules of evidence."

Finally, as the trial court recognized, the arbitrators had independent grounds for ruling in respondents' favor: the running of the statute of limitations and the filing of other actions by Davis in violation of FINRA rule 12209.[11] Because respondents were entitled to an award in their favor on these other grounds, the arbitrators' exclusion of Davis' expert witness did not prejudice her. (See *Hall v. Superior Court*, *supra*, 18 Cal.App.4th at p. 439; *Employers Ins. Of Wausau v. National Union Fire Ins. Co.* (9th Cir. 1991) 933 F.2d 1481, 1490 [court will not vacate arbitration award based on erroneous exclusion of evidence where arbitrator would not have made a different award had the evidence not been excluded].)[12]

---

[11] FINRA rule 12209 provides: "During an arbitration, no party may bring any suit, legal action, or proceeding against any other party that concerns or that would resolve any of the matters raised in the arbitration." The arbitrators found that Davis filed, in addition to the FINRA arbitration, claims with the American Arbitration Association and JAMS Arbitration, Mediation and ADR Services, as well as "a court case against sponsors of several of her investments," including in Sacramento and Texas. The arbitrators "found it highly likely that [Davis] sought double recovery from the claims [she] filed in this arbitration in other forums."

[12] Davis asserts that Schulz's testimony was necessary to refute respondents' statute of limitations defense. There is no evidence in the record, however, that Davis made such an offer of proof at the arbitration. Davis submitted a "rough outline" of what Schulz's testimony at the arbitration hearing would have been, but she did so only after

C. *The Failure of Phalen To Testify Does Not Require Vacating the Arbitration Award Under Section 1286.2, Subdivision (a)(1)*

Davis contends that the arbitration award must be vacated because respondents procured it by "corruption, fraud or other undue means" under subdivision (a)(1) of section 1286.2 in the form of witness intimidation. Subdivision (a)(1) applies whether the corruption, fraud, or undue means are perpetrated by the arbitrators or a party. (*Comerica Bank v. Howsam*, *supra*, 208 Cal.App.4th at p. 825; *Pacific Crown Distributors v. Brotherhood of Teamsters* (1986) 183 Cal.App.3d 1138, 1146-1147.)

Davis argues that "it is illegal to impose a prohibition upon testifying in other proceedings in a settlement agreement."[13] Although the settlement agreement between Phalen and WFP is not in the record, Reif referred to it in his declaration filed in opposition to Davis' motion to vacate the arbitration award as a "confidential settlement agreement," and he stated that it "contained 'Confidentiality and Non-Disparagement' provisions." There is case law suggesting that confidentiality provisions, perhaps like the ones in the Phalen-WFP settlement agreement (depending what they say), might be unenforceable, at least to the extent the confidentiality provisions prohibit communication with government security regulators.

For example, in *Cariveau v. Halferty* (2000) 83 Cal.App.4th 126 the court addressed "the validity of a confidentiality clause in a settlement agreement that prohibited the customer in a securities transaction from discussing the selling agent's misconduct with regulatory authorities." (*Id*. at p. 128.) The confidentiality provision

---

the arbitration in connection with her motion to vacate the award, and respondents properly objected to this document. Moreover, even if Davis had told the arbitrators how the exclusion of Schulz's testimony affected her ability to respond to respondents' statute of limitations defense, Davis has not challenged the arbitrators' additional basis for the award, violation of FINRA rule 12209.

[13] Although Davis cites Penal Code sections 136.1 and 138 regarding witness intimidation and bribing a witness in her briefs, she does not claim to have pressed charges against WFP under either of those statutes.

22

stated:  "'The terms and conditions of this Forbearance Agreement and Mutual Release and each and all of the underlying events resulting in the negotiation of this Agreement shall remain private and confidential in all respects and shall not be disclosed by any party hereto, . . . for any reason whatsoever, to any public or private person or entity, or to any administrative, law enforcement or regulatory agency.'" (*Id*. at p. 129, fn. omitted.)  The court held that the confidentiality clause violated public policy as expressed in the Securities Exchange Act of 1934 (15 U.S.C. § 78cc(b)) and NASD rules. (*Cariveau*, *supra*, at pp. 131, 133.)  "The confidentiality agreement sought to be enforced in this case expressly prohibited disclosure of the facts underlying the agreement to 'any public or private person or entity, or to any administrative, law enforcement or regulatory agency.'  The only exception to the prohibition was in the case of a party under a court order to disclose, if the party was not responsible for initiation of the inquiry resulting in the order." (*Id*. at p. 134.)  The selling agent "admitted that the purpose of the confidentiality clause . . . was to prevent the customer from disclosing [her improper actions] to the NASD and the employer." (*Id*. at pp. 134-135.)  The court concluded that "[t]he public policy express and implied from the securities laws and regulations outweighs the general interest in settling disputes without litigation.  To permit [the agent's] violations of rules and shield them from administrative review in an agreement to silence wrongdoing would undermine the public's confidence in the integrity of securities oversight.  This type of secret settlement should not be left in some dark oubliette,[14] leaving investors unprotected.  To countenance this agreement would encourage future NASD violators to hide their misdeeds in a secret agreement free from the light of regulatory scrutiny." (*Id*. at p. 137; see *Williamson v. Superior Court* (1978) 21 Cal.3d 829, 836 ["[a]greements to suppress evidence have long been held void as against public policy"]; *Smith v. Superior Court* (1996) 41 Cal.App.4th 1014, 1026 [stipulated injunction prohibiting employee from testifying or consulting in connection

---

**14**    An oubliette is a dungeon with a door or other opening only at the top.

23

with any future litigation against employer violated "our fundamental public policy against suppression of evidence"].)

Davis, however, never asked the arbitrators to compel Phalen to attend the arbitration in order to determine whether respondents had acted improperly and intimidated him into refusing to testify, and to allow Brown to question Phalen and the panel to rule on any confidentiality objections respondents might make to specific questions. The arbitrators never held a hearing on the nature and validity of the confidentiality provisions or on the issue of possible witness intimidation and whether WFP used undue means to prevent Phalen from testifying. The after-the-fact declarations submitted in support of and opposition to Davis' petition to vacate the arbitration award are not a substitute for an evidentiary hearing at the arbitration on these issues. (Cf. *Glaser, Weil, Fink, Jacobs & Shapiro, LLP v. Goff* (2011) 194 Cal.App.4th 423, 436, fn. 4 ["independent judicial review of whether an arbitration award was binding" does not "require the trial court to take live testimony rather than relying on written submissions such as declarations or the arbitration record].)

In the trial court, Reif generally denied engaging in any intimidation or other wrongful conduct and specifically denied the charges made by Brown and Phalen. Reif stated in his declaration that he sent Uhl, Phalen's attorney, a letter "reiterating the terms of Phalen's settlement agreement with WFP" and "emphasiz[ing] . . . the 'Confidentiality and Non-Disparagement' provisions." Reif denied Phalen's statement that Reif had orally threatened him and agreed with Phalen that the two of them "never spoke or communicated in writing or verbal[ly], ever." Reif denied Brown's statement that Reif had spoken directly with Phalen and denied Brown's accusation that he had "threatened to sue Mr. Phalen if he appeared as a witness on [Davis'] behalf" at the arbitration. Reif stated that he informed Brown there was a settlement agreement between Phalen and Brown containing confidentiality provisions and that he "intended to recommend that the non-breaching parties to the confidential settlement agreement would seek to enforce its provisions."

24

Absent a sufficient record of the terms of the confidentiality provisions in the settlement agreement between Phalen and WFP, we cannot find that they are void as against public policy and unenforceable.  Nor can we conclude that respondents and their attorneys used the settlement agreement to intimidate Phalen, who was represented by counsel, from testifying at the arbitration, and thereby procured the award by corruption, fraud, or undue means.  There is substantial evidence to support the trial court's resolution of this conflict in the evidence and the court's implied finding that Reif's statements did not amount to threats to sue Phalen for merely appearing at the arbitration.

## DISPOSITION

The order is affirmed.  Respondents are to recover their costs on appeal.


SEGAL, J.*


We concur:



PERLUSS, P. J.



WOODS, J.

---

*	Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.