[No. A087296. First Dist., Div. One. Aug. 18, 2000.]

TOM CARIVEAU, as Trustee, etc., Plaintiff and Appellant, v. LORALYNN HALFERTY, Defendant and Respondent.

■■■■■■■■■■■■

COUNSEL

Brandt-Hawley & Zoia, Rose M. Zoia; Fritz Law Offices and William F. Fritz for Plaintiff and Appellant.

Andrian & Gallenson and Chris P. Andrian for Defendant and Respondent.

OPINION

MARCHIANO, J.—This action concerns the validity of a confidentiality clause in a settlement agreement that prohibited the customer in a securities transaction from discussing the selling agent's misconduct with regulatory authorities. The trial court refused to enforce the clause on grounds of public policy. We agree and affirm.

## BACKGROUND

Marion L. Hixon[1] joined the staff of The Equitable Life Assurance Society of the United States (Equitable) as an insurance agent in 1987 and subsequently became a registered agent under the rules of the National Association of Securities Dealers, Inc. (NASD).[2] In November of 1992, Loralynn Halferty consulted Hixon about investing approximately $200,000 she inherited from her father. Initially, Halferty invested in mutual funds and trust funds with Equitable through Hixon. In January of 1993, Halferty invested $79,950 in two real estate limited partnerships and $10,000 in a Nevada corporation named Jendevco.[3] Hixon was the general partner of the partnerships and president of the corporation.

Shortly after making these investments, Halferty conferred with other investment advisers and concluded that the investments recommended by

---

[1] The parties stipulated to the substitution of the trustee of the assets of Marion L. Hixon's estate in May of 1998 as plaintiff in this action.

[2] The NASD, established under the authority of the 1938 Maloney Act amendments to the Securities Exchange Act of 1934, is the self-regulatory organization of the securities industry. (See National Association of Securities Dealers, Inc., Corporate Descriptions <http://www.nasd.com/pr_section1. html> [as of June 23, 2000]; 15 U.S.C. § 78a et seq.; *U. S. v. National Assn. Securities Dealers* (1975) 422 U.S. 694, 732 [95 S.Ct. 2427, 2449, 45 L.Ed.2d 486].) NASD bylaws require registration by all persons engaged in the investment banking or securities business. (NASD Manual (1997) Corporate Organization, Bylaws, art. III, § 1 (CCH) p. 1303-3.) When a registrant signs the required NASD registration forms, he or she agrees to comply with the rules and regulations of the organization. (*Desiderio v. National Ass'n of Securities Dealers* (S.D.N.Y. 1998) 2 F.Supp.2d 516, 518-519, cert. den. (2001) __ U.S. __ [121 S.Ct. 756, 148 L.Ed.2d 659].)

[3] The record on appeal does not disclose the fate of the other two entities, but it appears that the Willow Tree Park limited partnership was bankrupt by July of 1995.

Hixon were risky and inappropriate and that Hixon had possibly violated ethical standards relating to securities dealers. In the fall of 1993, Halferty told Hixon several times that she wanted the funds invested in the real estate ventures returned to her, and that she would speak with Hixon's supervisor if the money was not returned. Hixon said "If you do that, you'll get me in a lot of trouble."

After receiving a letter from Hixon's attorney, Halferty retained her own counsel to assist her in recovering the invested funds. On or about January 3, 1994, Hixon and Halferty entered into a written "Forbearance Agreement and Mutual Release" (Forbearance Agreement). Hixon told Halferty that the only way she would get her money back was to sign the agreement. The agreement provided for repayment of Halferty's investment in the entities, with interest. Paragraph 18 of the agreement provided as follows: "The terms and conditions of this Forbearance Agreement and Mutual Release and each and all of the underlying events resulting in the negotiation of this Agreement shall remain private and confidential in all respects and shall not be disclosed by any party hereto, . . . for any reason whatsoever, to any public or private person or entity, or to any administrative, law enforcement or regulatory agency."[4]

During January of 1994, Halferty had two or three conversations with Marilyn Batt at Equitable, seeking to have Hixon removed as her account representative. Batt told Halferty that there had been other complaints about Hixon and recommended that Halferty make a formal complaint to Tom Hafner at Equitable.

On February 16, 1994, Halferty wrote a letter to Tom Hafner at Equitable, complaining about many instances of Hixon's conduct, including her failure to explain or obtain a waiver of her conflict of interest in the limited partnership investments. Halferty demanded $5,000 as compensation for the legal fees incurred in rectifying Hixon's improper actions. Although Equitable responded that Hixon had done nothing wrong, it subsequently terminated Hixon's employment.

In May of 1994, the NASD notified Hixon that it had received a uniform termination notice for securities industry registration (form U-5), which referenced activities within the scope of NASD regulatory responsibilities. Consequently, the NASD began an investigation to determine whether Hixon

---

[4]The Forbearance Agreement provided, in the case of a party that is subpoenaed or under court order to disclose the subject matter of the agreement, the confidentiality clause would be waived, provided, however, that the party relying on the waiver was not, "either personally or by acting through another person or entity, responsible for the initiation of the inquiry which resulted in the subpoena or court order."

had violated the NASD rules of fair practice. The improper activity concerned Hixon's outside business activities relating to the real estate limited partnerships.

In a written decision dated April 18, 1996, the NASD fined and censured Hixon and barred her from associating with any member of the NASD in any capacity. The NASD sanctions were based on Hixon's improper outside sales of the real estate interests, her personal interest in the ventures, the submission of false representations denying such outside sales and the failure to provide information to the NASD. The NASD Business Conduct Committee determined that the confidentiality clause in Hixon's contract with Halferty was a continuation of Hixon's attempts to conceal her misconduct from her employer and the NASD.

On June 6, 1994, Hixon sued Halferty, alleging breach of contract and other causes of action related to Halferty's disclosure of the information regarding Hixon's outside business dealings in violation of the confidentiality clause of the Forbearance Agreement. On March 2, 1997, Hixon was shot to death. Her appeal, pending before the National Business Conduct Committee of the NASD, was dismissed.[5] On May 20, 1998, the parties to this action stipulated to the substitution of the trustee of the assets of Hixon's estate as plaintiff. The matter was tried to the court on December 16, 17 and 23, 1998, and January 29 of 1999. The court issued a tentative decision on March 8, 1999, finding that the confidentiality clause that was the basis of Hixon's complaint against Halferty was void and unenforceable as a violation of the public policies expressed in the NASD rules and the Securities Exchange Act of 1934. (15 U.S.C. § 78a et seq.)

Judgment was entered on April 8, 1999, and Hixon's representative has appealed.

## DISCUSSION

█ On appeal, appellant argues that the applicable public policy in this case is the policy favoring settlement of disputes. Appellant contends that the confidentiality clause in this case was valid and enforceable and did not violate NASD rules. Despite the existence of pervasive regulatory oversight of securities dealers, appellant argues that contracts settling disputes are generally enforceable. Appellant also relies on *Philippine Export & Foreign*

---

[5]The NASD has a system of discipline of its members that is subject to oversight and de novo review by the Securities Exchange Commission (SEC). "A person aggrieved by a final order of SEC in such a case may obtain review of the order in the appropriate U.S. Court of Appeals. [15 U.S.C.] § 78y(a)(1)." (*General Bond & Share Co. v. S.E.C.* (10th Cir. 1994) 39 F.3d 1451, 1453.)

*Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058 [267 Cal.Rptr. 457] to support the contention that questionable contract terms will be judicially enforced. Finally, appellant cites several federal cases involving settlement agreements in securities actions that were held to be enforceable. From these strands of argument, appellant concludes that the confidentiality agreement in this case is enforceable as a matter of law.[6] We have reviewed the relevant authorities, and we agree with the trial court that the contract provision at issue violated public policy.

*Public Policy as a Defense to Contract Terms*

Appellant cites *Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832 [247 Cal.Rptr. 340], for its discussion of the need to exercise caution in applying public policy reasons to nullify contractual terms in otherwise enforceable contracts. Appellant relies on the *Bovard* court's reference to an 1895 Supreme Court case stating: " '. . . "It has been well said that public policy is an unruly horse, astride of which you are carried into unknown and uncertain paths, . . . While contracts opposed to morality or law should not be allowed to show themselves in courts of justice, yet public policy requires and encourages the making of contracts by competent parties upon all valid and lawful considerations, and courts so recognizing have allowed parties the widest latitude in this regard; and, unless it is entirely plain that a contract is violative of sound public policy, the court will never so declare." ' " (*Bovard v. American Horse Enterprises, Inc., supra,* at pp. 838-839, citing *Stephens v. Southern Pacific Co.* (1895) 109 Cal. 86, 89-90 [41 P. 783].)

Despite the cautionary admonition from *Stephens,* the court in *Bovard* found that a contract to sell a business that manufactured drug paraphernalia was void as against public policy. The *Bovard* court referred to a quote from section 178 of the Restatement Second of Contracts regarding a contract being unenforceable on public policy grounds if: ". . . 'legislation provides that it is unenforceable or the interest in its enforcement is clearly out-weighed in the circumstances by a public policy against the enforcement of such terms.' " (*Bovard v. American Horse Enterprises, Inc., supra,* 201 Cal.App.3d at p. 840.) The court found that public policy was "strongly implied" by the laws against possession and use of the drugs intended to be facilitated by the parties' paraphernalia. (*Id.* at p. 841.)

Section 178 of the Restatement Second of Contracts provides: "A promise or other term of an agreement is unenforceable on grounds of public policy

---

[6]Appellant also raises an issue regarding the court's finding of unclean hands, which we do not reach in light of our conclusion that the confidentiality clause violated public policy.

if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Comment (a) to section 178 notes that: "Occasionally, on grounds of public policy, legislation provides that specified kinds of promises or other terms are unenforceable." The comment also states: "The term 'legislation' is used here in the broadest sense to include any fixed text enacted by a body with authority to promulgate rules, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them." (Rest.2d Contracts, § 178, com. a, p. 7.)[7]

In *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66 [78 Cal.Rptr.2d 16, 960 P.2d 1046], our Supreme Court recognized that "fundamental public policy may be enunciated in administrative regulations that serve the statutory objective." (*Id.* at p. 80 [agency regulations provide public policy limitation on legislative at-will provision regarding employment contracts].) The court recognized that although the Legislature is primarily vested with the power to declare public policy, regulations enacted under the authority of a statute are valid sources of public policy.

In addition to statutes and administrative regulations, the common law may be a source of public policy in this context. Recently, in *Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060 [95 Cal.Rptr.2d 496, 997 P.2d 1153], our Supreme Court found that a health insurer's contract provision allowing removal of a physician from its list of preferred providers without cause violated public policy supporting the common law right to fair procedure. The court stated: "California courts, too, are loathe to enforce contract provisions offensive to public policy. (*Kreamer v. Earl* (1891) 91 Cal. 112, 117 [27 P. 735] [' "No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication." ']; . . .)" (*Id.* at p. 1073.)

█ Public policy, in the context of a court's refusal to enforce a contract term, may be based on the policy expressed in a statute or the rules of a voluntary regulatory entity, or may be implied from the language of such statute or rule. (See, e.g., *Kallen v. Delug* (1984) 157 Cal.App.3d 940, 951 [203 Cal.Rptr. 879] [contracts violating State Bar canons of professional ethics may be void as contrary to public policy].) When the policy of the statute or rule outweighs the interest in enforcement of the contract term, a court will not assist in giving effect to the offending term.

---

[7]The rule of section 178 of the Restatement Second of Contracts is expressed in Civil Code section 1667, which declares contracts contrary to "an express provision of law . . . [¶] [or c]ontrary to the policy of express law, though not expressly prohibited; or, [¶] [o]therwise contrary to good morals" to be unlawful.

*The Forbearance Agreement Violated Express and Implied Public Policy*

 In its statement of decision, the trial court in this case identified the statute and the administrative rules on which the court based its finding that the contract at issue violated public policy. The court listed section 29(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78cc(b) [contracts in violation of 1934 act are void]), the former NASD Rules of Fair Practice, article III, sections 1, 40 and 43 (regarding high ethical standards and restrictions on outside sales), and article IV, section 5 (member's obligation to provide information to NASD).[8] The rules require reporting outside business activities to a member's employer so that the employer can maintain effective oversight of the activities. The rules also encourage aggrieved investors to report wrongdoing so that the integrity of the system is preserved.

NASD rules are derived from, and carry out the purposes of, the Securities Exchange Act of 1934. The NASD was created under the auspices of section 15A of the Securities Exchange Act of 1934. (15 U.S.C. § 78o-3(a)-(i).) Section 15A authorizes the creation of national securities associations to be registered with the SEC. (15 U.S.C. § 78o-3(a).)[9] (*U.S. v. National Assn. Securities Dealers, supra*, 422 U.S. at pp. 700-701, fn. 6 [95 S.Ct. at p. 2434].) "The SEC, in its exercise of authority over [NASD] rules and practices, is charged with protection of the public interest as well as the

---

[8]The current version of article III, section 1, of the former NASD Rules of Fair Practice, is found in the NASD Manual, Conduct Rules, rule 2110 (requiring members to observe "high standards of commercial honor and just and equitable principles of trade. . . ."). Former article III, sections 40 and 43 are now located in the NASD Manual, Conduct Rules, rules 3030 and 3040 (restrictions on transactions outside scope of relationship with employer and on participation in private securities transactions without prior notice to, and approval by, employer). (See *Stoiber v. S.E.C.* (D.C. Cir. 1998) 161 F.3d 745, 747 [333 App.D.C. 195]; Securities and Exchange Com., Self-Regulatory Organizations, Proposed Rule Change by National Association of Securities Dealers, Inc. Relating to Outside Business Activities of Associated Persons, 53 Fed.Reg. 35395 (Sept. 13, 1988).) The requirements of former article IV, section 5 appear in the NASD Manual, Procedural Rules, rule 8210 regarding a member's obligation to provide information to NASD. (See NASD Manual (1997) Rules of the Association, Complaints, Investigation & Sanctions, rule 8210 (CCH) pp. 7241-7242; *General Bond & Share Co. v. S.E.C., supra*, 39 F.3d at p. 1460 [member's obligation to provide information when requested by the NASD].)

[9]The policy of the Securities Exchange Act of 1934 is expressed, in part, as follows: "For the reasons hereinafter enumerated, transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, . . . to require appropriate reports, . . . and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, . . . and to insure the maintenance of fair and honest markets in such transactions . . . ." (15 U.S.C. § 78b.)

interests of shareholders . . . ." (*Id.* at p. 732 [95 S.Ct. at p. 2449].) The NASD rules serve the statutory objectives of protecting the public from unethical practices, providing supervision of the activities of NASD members, and promoting public confidence in the integrity of effective self-regulation. Thus, the NASD rules are a valid source of public policy and provide a guiding bridle for the unruly steed.

"NASD is the only securities association registered with the [SEC] under 15 U.S.C. § 78o-3, and is the primary regulatory body for the broker-dealer industry. It supervises the conduct of its members under the general aegis of the SEC."[10] (*Sparta Surgical v. Nat. Ass'n of Sec. Dealers, supra,* 159 F.3d at p. 1210.) The federal statute authorizing creation of the NASD requires the rules of that organization to be designed "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, . . . and facilitating transactions in securities, . . . and, in general, to protect investors and the public interest . . . ." (15 U.S.C. § 78o-3(b)(6).) " '[E]very case from every court recognizes that when a statute has been made for the protection of the public, a contract in violation of its provisions is void.' [Citation.]" (*Tatterson v. Kehrlein* (1927) 88 Cal.App. 34, 48 [263 P. 285] [discussing California corporate securities act].) Contracts that violate the Securities Exchange Act of 1934 are unenforceable.[11] (15 U.S.C. § 78cc(b).)

The confidentiality agreement sought to be enforced in this case expressly prohibited disclosure of the facts underlying the agreement to "any public or private person or entity, or to any administrative, law enforcement or regulatory agency." The only exception to the prohibition was in the case of a party under a court order to disclose, if the party was not responsible for initiation of the inquiry resulting in the order. Article III, section 1 of the former NASD Rules of Fair Practice required members to observe "high standards of commercial honor and just and equitable principles of trade." The NASD Business Conduct Committee's opinion in its investigation of Hixon's activities stated that she admitted that the purpose of the confidentiality clause in the Forbearance Agreement was to prevent the customer

---

[10] " 'Under the Exchange Act, the Exchange performs a variety of regulatory functions that would, in other circumstances, be performed by a government agency.' " (*Sparta Surgical v. Nat. Ass'n of Sec. Dealers* (9th Cir. 1998) 159 F.3d 1209, 1214.)

[11] Title 15 United States Code section 78cc(b) provides: "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . ." (See *Mills v. Electric Auto-Lite* (1970) 396 U.S. 375, 386-388 [90 S.Ct. 616, 622-623, 24 L.Ed.2d 593] [contracts in violation of § 29(b) are voidable at the option of the innocent party]; 15 U.S.C. § 78cc(b).)

from disclosing the improper outside sales to the NASD and the employer. The NASD concluded that the confidentiality clause was a continuation of Hixon's false reports, that was expressly intended to cover up her improper actions and allow the unsupervised prohibited sales to continue for a period of four years. The Forbearance Agreement required suppression of information that Hixon was required to report to her employer and the NASD. It also allowed Hixon to continue to violate the rules regarding outside sales, facilitated her periodic false reports to her employer, and frustrated the NASD's self-regulation policies.

Appellant relies strongly on *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian, supra,* 218 Cal.App.3d 1058 to argue that contracts facilitating dishonesty and other offensive conduct are not necessarily illegal or violative of public policy. The *Philippine Export* case involved an action by a Philippine government-owned entity against an individual and his corporations seeking to enforce loan guarantees from the Philippine entity. A settlement of the litigation provided for relinquishment of all claims against the individual and his companies and payment of $5.3 million to the individual in exchange for the stock in three corporations. The individual also agreed to sign an affidavit denying that the Marcos family had any interest in his companies. (*Id.* at pp. 1068-1069.) The Philippine entity later sought to set aside the settlement, claiming that the Marcos government compelled it to settle and that the agreements were illegal because they sought to prevent the individual from exposing the Marcoses' improper financial interests in the companies. (*Philippine Export & Foreign Loan Guarantee. Corp. v. Chuidian, supra,* at p. 1069.)

The facts of the *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian, supra,* 218 Cal.App.3d 1058 case distinguish it from this case. Significantly, the court in *Philippine Export* determined that the agreement did not require perjury or lies. The court also rejected the contention that the agreement illegally required the parties to keep the settlement private, noting that it was not an agreement to withhold evidence or violate a duty to disclose.[12] (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian, supra,* at p. 1082.) The court determined that the record supported the conclusion that the statement regarding the Marcoses' lack of involvement was true. (*Ibid.*)

Although the agreement in this case does not require affirmative falsehoods, it concealed Hixon's misconduct and other actions harmful to the

---

[12]The *Philippine Export* court cited *Allen v. Jordanos' Inc.* (1975) 52 Cal.App.3d 160 [125 Cal.Rptr. 31], which concerned a settlement agreement in which an employer agreed not to disclose to the Department of Human Resources Development that the employee was terminated due to suspicion of theft and dishonesty. The court refused to enforce the contract because the term regarding nondisclosure to the state agency was void. (*Id.* at p. 166.)

public in general. In contrast to the *Philippine Export* case, appellant here has not challenged the sufficiency of the evidence to support the trial court's factual findings that Hixon engaged in behavior that violated regulatory rules and policy that were enacted to protect the public interest. Furthermore, Hixon, unlike the parties in *Philippine Export*, was under an affirmative duty pursuant to the NASD rules and policy, to disclose her outside dealings to her employer and was subject to a policy that disapproved of actions preventing customers from discussing misconduct with an agent's employer and the NASD. The use of confidentiality agreements that purport to restrict a registered member's customers from reporting improper conduct to the NASD serves to perpetuate the improper conduct and is condemned by NASD policies.[13]

The only interest appellant identifies in support of the contract term is the general policy in favor of promoting the settlement of disputes. On the other hand, when one recognizes and applies the factors listed in section 178 of the Restatement Second of Contracts, the policy of maintaining an honest and fair national marketplace in securities has been declared as a "national public interest" in the Securities Exchange Act of 1934.[14] (15 U.S.C. § 78b.) Refusing to enforce the confidentiality clause does not affect the settlement of the dispute between Hixon and Halferty, but merely declines assistance to Hixon's concealment of her wrongdoing. No forfeiture is involved, no special interest supports allowing a wrongdoer to hide his or her wrongful acts and continue to take advantage of the malefactor's unsuspecting customers and employer. The inclusion of a restrictive confidentiality clause in

---

[13]In a 1995 notice to members, the NASD instructed its members that confidentiality clauses in settlement agreements must contain an express statement authorizing the customer to respond, without condition, to any inquiry about the settlement by any securities regulator, including the NASD. The notice to members referenced concern with such agreements, expressed as early as a 1986 notice to members cautioning that use of agreements that may prevent a customer from providing information to the NASD may be a violation of former article IV, section 5 of the NASD Rules of Fair Practice. (NASD Regulation, Books on Screen: Notices to Members, Notices 95-87; 86-36 <http://secure.nasdr.com> [as of Aug. 17, 2000].)

[14]The Restatement lists a number of factors to consider when determining the interest in enforcing a contract term:

"(2) In weighing the interest in the enforcement of a term, account is taken of

 "(a) the parties' justified expectations,

 "(b) any forfeiture that would result if enforcement were denied, and

 "(c) any special public interest in the enforcement of the particular term.

"(3) In weighing a public policy against enforcement of a term, account is taken of

 "(a) the strength of that policy as manifested by legislation or judicial decisions,

 "(b) the likelihood that a refusal to enforce the term will further that policy,

 "(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

 "(d) the directness of the connection between that misconduct and the term."

(Rest.2d Contracts, § 178.)

the Forbearance Agreement is not only directly connected to Hixon's misconduct, but is an instance of misconduct in itself. The public policy express and implied from the securities laws and regulations outweighs the general interest in settling disputes without litigation. To permit Hixon's violations of rules and shield them from administrative review in an agreement to silence wrongdoing would undermine the public's confidence in the integrity of securities oversight. This type of secret settlement should not be left in some dark oubliette, leaving investors unprotected. To countenance this agreement would encourage future NASD violators to hide their misdeeds in a secret agreement free from the light of regulatory scrutiny.

*Cases Involving Settlement of Securities Actions Are Not Dispositive of the Issue*

Appellant relies on several federal cases to argue that settling litigation of securities act violations is not contrary to public policy. Appellant misses the point, as the cited cases do not involve confidentiality clauses with the effect of allowing the broker or agent to continue violating NASD rules. (*Cohen v. Tenney Corporation* (S.D.N.Y. 1970) 318 F.Supp. 280 [waiver of the right to sue in general release was not improper waiver of compliance with the securities laws]; *Mittendorf v. J.R. Williston & Beane Incorporated* (S.D.N.Y. 1974) 372 F.Supp. 821 [general release in exchange for partial payment of a debt in connection with securities transactions]; *Valerio v. Boise Cascade Corp.* (N.D.Cal. 1978) 80 F.R.D. 626, 656 [settlement by class members in real property sales action did not itself violate the securities acts].) Unlike the agreement at issue in this case, the settlements in the cited cases did not operate to prohibit the reporting of regulatory violations.

*Pearlstein v. Scudder & German* (2d Cir. 1970) 429 F.2d 1136, cited by appellant as the lone exception to the policy favoring settlement, is actually an expression of the general rule against enforcing agreements that allow violations of the securities laws to continue. The settlement term at issue in *Pearlstein* allowed the defendant broker to engage in further instances of illegal extensions of credit to the customer. Thus, the term of the settlement perpetuated the illegal transaction and the settlement was held void under section 29(a) of the Securities Exchange Act of 1934, pertaining to waivers of compliance with the Act. (15 U.S.C. § 78cc(a).)

The agreement offered by Hixon and signed by Halferty expressly prohibited reporting Hixon's improper outside sales activity to the entities responsible for protecting the public from violations. (*In re Stratton Oakmont, Inc.* (Mar. 12, 1997) 64 SEC Docket 146 [1997 WL 112329] [NASD member firm that settled customer claims with confidentiality agreements preventing

customers from cooperating with NASD investigation violated NASD rules and undermined regulatory function].) The contract term at issue in this case violates the NASD rules as well as the prohibition of the Securities Exchange Act of 1934 of contracts that involve the continuance of a violation of the act.

## CONCLUSION

The trial court's decision is supported by the law pertaining to the NASD, the Securities Exchange Act of 1934, and the policy against enforcement of contract terms that violate the express public policies requiring NASD members to observe the high standards and equitable principles of trade and refrain from suppressing disclosure to the regulatory bodies. The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.