Filed 9/23/16  DCCCA1, Inc. v. Diversified Product Industries, Ltd. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DCCCA1, INC.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DIVERSIFIED PRODUCT INDUSTRIES, LTD.,<br><br>    Defendant and Appellant. | A143175<br><br>(Alameda County<br>Super. Ct. No. RG13675188)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING NO CHANGE IN JUDGMENT** |

**THE COURT:**

It is ordered that the opinion filed herein on August 30, 2016, be modified as follows:

On the signature page, the name Miller, J. should be deleted and replaced with the name Stewart, J. so that the panel names as listed are Kline, P.J., Richman, J., and Stewart, J.

Appellant's petition for rehearing is denied.  There is no change in judgment.

Dated: _____          _____

                                                                    Kline, P.J.

Filed 8/30/16  DCCCA1, Inc. v. Diversified Product Industries, Ltd. CA1/2 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DCCCA1, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DIVERSIFIED PRODUCT INDUSTRIES, LTD., <br><br> Defendant and Appellant. | A143175 <br><br> (Alameda County <br> Super. Ct. No. RG13675188) |

Diversified Industries, Ltd. (DPI) appeals after the trial court entered judgment on behalf of DCCCA1, Inc. (Doppelmayr),[1] in Doppelmayr's action for declaratory relief and specific performance of the parties' settlement agreement.  DPI contends the settlement agreement violates public policies of California and the United States because it purports to prohibit DPI from reporting any crimes or other violations of law by Doppelmayr.  DPI also makes several other arguments, including that the trial court's judgment is not supported by substantial evidence and that the court's order of specific performance was unwarranted.  We shall affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2009, Bay Area Rapid Transit (BART) began the Oakland International Airport Connector (OAC) construction project, seeking to build a system to transport passengers between its Coliseum station and Oakland International Airport.  Two construction

---

[1] Doppelmayr Cable Car GmbH & Co KG is the Austrian parent company of DCCCA1.

companies, Flatiron West, Inc. and Parsons Transportation Group, Inc. formed a joint venture, Flatiron/Parsons, to partially design and build the system. Doppelmayr was a subcontractor on the joint venture, hired to build the steel guideway to be used in the OAC.

DPI, a disadvantaged business enterprise (DBE), pursuant to title 49, part 26 of the Code of Federal Regulations,[2] is a steel supplier for construction projects. In September 2009, DPI submitted a revised bid on the OAC project, offering to supply 7125 tons of steel for $13,157,997. DPI indicated that it planned to add a four percent markup to its cost for the materials.[3] DPI was listed on Flatiron/Parsons' bid to BART as its sole DBE structural steel supplier on the OAC project, for 5.09 percent of the cost of the construction phase. After Flatiron/Parsons won the prime contract on the project, Doppelmayr hired DPI to provide it with the steel it needed on the project, although no written contract was ever executed.

In February 2011, DPI informed Doppelmayr that a steel mill from which it planned to obtain steel had increased its prices by $130 per ton and stated that its quoted price would increase by that amount, plus four percent. In March 2011, before placing any orders with DPI, Doppelmayr consulted with steel suppliers and fabricators and determined that four percent was a relatively high markup. It therefore asked DPI to reduce its markup to three percent. According to DPI's president, Jack Pryor, DPI planned to "follow through with the job" and "deal with" the three percent markup issue "later."

---

[2] Under the regulations, BART was required to adopt a local DBE utilization program and to require that its contractors on the OAC project meet the 18 percent DBE goal for the construction phase of the project themselves or through their subcontractors, or "make good faith efforts" to do so. (See 49 C.F.R. §§ 26.21, 26.5, 26.53(a)-(d).)

[3] DPI later claimed that the four percent markup was meant to be a contingency amount to cover any further rises in steel prices, and that its total intended markup had been 10 to 15 percent.

For the next nine months, Doppelmayr placed orders for steel with DPI at the three percent markup, and DPI filled those orders. Doppelmayr made progress payments to DPI, which DPI acknowledged with signed and notarized "unconditional waiver and release upon progress payment." Doppelmayr paid for the steel purchases on price terms specified in DPI's invoices "through joint checks, one issued to DPI and the steel fabricator for the cost of the steel and the other issued solely to DPI for its 3% mark-up on the steel order, shipping costs, and sales tax." Doppelmayr ultimately placed orders for 7816 tons of steel—including the 7,125 tons specified in DPI's original proposal plus an additional 691 tons—for which DPI received the three percent markup.

In December 2011, DPI sent Flatiron/Parsons and Doppelmayr a letter in which it claimed that DPI was entitled to almost $3 million in additional payments under the terms of its September 2009 revised quote, and demanded immediate payment of that amount.[4] In February 2012, DPI's counsel sent Doppelmayr another letter, this time demanding a total of $1,856,384.42 in additional payments.

The parties thereafter participated in mediation, but the mediation failed to settle the dispute. The parties continued to communicate and, in August 2012, signed a settlement agreement, under which Doppelmayr agreed to pay DPI an additional $666,727 plus sales tax, which represented an additional 5.5 percent markup on the first 7,125 tons of steel ordered and an additional 5 percent markup on the next 691 tons, for a total markup of 8.5 and 8 percent respectively. The settlement agreement further provided that Doppelmayr had no obligation to place any additional steel orders with DPI beyond those amounts already ordered as of the date of settlement, that DPI would not oppose Doppelmayr's use of other steel suppliers, and that DPI would not argue that Doppelmayr or Flatiron/Parsons had "not fulfilled their Disadvantaged Business Enterprise obligations as it relates to steel purchases for the OAC Project." The settlement agreement also contained a provision requiring that the parties keep the

---

[4] On that same date, a DPI employee sent an email to Doppelmayr, stating that DPI's revised bid in September 2009, had "included a profit margin of 15%-17%."

content of negotiations and the settlement agreement confidential, except that either party "may disclose the terms, conditions and payments made pursuant to this Settlement Agreement if required by law, contract, or tax requirements." Finally, the section of the settlement agreement related to the mutual release of unknown claims provided that DPI would not "assert any claim arising out of or related to the Dispute with and/or against BART."

On August 15, 2012, Doppelmayr paid DPI the agreed settlement amount of $666,727 plus $58,333.61 in sales tax, for a total payment amount of $725,065.61. Doppelmayr subsequently purchased an additional $1,690,000 worth of steel directly from a steel fabricator.

On September 5, 2012, approximately one month after settling with Doppelmayr, DPI's president, Pryor, sent a letter to BART in which he requested "that BART allow our company to finish the job by furnishing the entire quantity of steel required for the OAC project." When Doppelmayr informed DPI that the letter violated the settlement agreement, DPI sent another letter to BART stating that "[t]his notification rescinds the previous letter." However, on February 22, 2013, DPI sent a stop payment notice to BART, claiming that Flatiron/Parsons owed DPI $1,954,426.53 for steel DPI had supplied for the OAC project.[5] DPI announced the stop payment notice in a press release. BART informed DPI that the stop payment notice was invalid because DPI had failed to comply with the requirement, under Civil Code section 9300, that it provide preliminary notice to BART and Flatiron/Parsons before filing the notice. DPI then sent an amended stop payment notice to BART. BART responded that it had found, as with the prior notice, "no evidence that this Notice is valid."

---

[5] Pursuant to a "stop payment notice," a subcontractor working on a public project makes a written claim to a public entity that the contractor has not paid it for work it has provided. (Civ. Code, §§ 8044, 9352.) Upon receipt of the notice, the public entity must withhold funds from the contractor sufficient to pay the claim, and the contractor or subcontractor may then commence a court action for a declaration of contract rights. (Civ. Code, §§ 9358, 9408.)

4

On April 11, 2013, Doppelmayr filed a complaint against DPI, seeking (1) a declaration that the settlement agreement was valid and "in accord with public policy, and bars DPI's claims for further payment for any amounts related to the steel sold to Doppelmayr for the [OAC] Project," and (2) specific performance of the terms of the settlement agreement based on accord and satisfaction. After Doppelmayr filed its complaint, DPI filed a $2 million surety bond claim with Flatiron/Parsons' surety insurer, in which it asserted that it had delivered 8,364 tons of steel for use in the OAC project. In its second amended answer to Doppelmayr's complaint, DPI set forth numerous affirmative defenses, including, inter alia, mistake, duress and coercion, and violation of public policy.

On May 24, 2014, the court denied Doppelmayr's summary judgment motion. In April 2014, the matter proceeded to a court trial and, on August 14, 2014, the court issued a statement of decision in which it found that (1) Doppelmayr had established that it was entitled to a declaration that the settlement agreement was valid and enforceable, (2) Doppelmayr had established the requisite elements for specific performance of the settlement agreement based on accord and satisfaction, (3) DPI had failed to establish its defense of economic duress/coercion, (4) DPI had failed to establish its defense of mistake, (5) DPI had failed to establish its defenses based on illegality,[6] and (6) DPI had failed to carry its burden of proving any of its remaining affirmative defenses.[7]

---

[6] In light of its finding that DPI was not coerced into settling the matter, the court found that DPI was estopped from claiming that it was improperly terminated as a DBE. The court further found, in any event, that Doppelmayr had not terminated DPI in violation of DBE regulations. The court also rejected DPI's claim that the confidentiality clause was intended to act as a " 'gag order' " to prevent DPI from reporting DBE violations.

[7] The court stated that DPI had failed to present any evidence supporting those affirmative defenses, which included failure to state a claim, waiver, estoppel, unclean hands, uncertain and ambiguous, contract lacks essential terms, indispensable parties, adequate remedy at law, exhaustion of administrative remedies, violation of Penal Code section 153, and concealment.

The court therefore declared "that the Settlement Agreement is valid and enforceable in all respects, that it constitutes a full accord and satisfaction of DPI's claims relating to DPI's pricing of steel for the OAC Project, that it is not illegal and does not violate public policy, and that it bars, compels and enjoins DPI's claims for further payment for any amounts related to the steel that it sold to Doppelmayr for the OAC Project." The court further ordered DPI "to perform the Settlement Agreement based upon accord and satisfaction."

On August 4, 2013, the court entered judgment in favor of Doppelmayr.[8]

DPI subsequently filed a motion to set aside and vacate the judgment, pursuant to Code of Civil Procedure section 663, or, in the alternative, for a new trial, pursuant to section 657. The motion addressed only the court's alleged failure to address DPI's arguments regarding Doppelmayr's compliance with DBE requirements. As the court summarized, DPI claimed "that the Settlement Agreement was illegal because it violated the law by providing that DPI agreed not to contest or oppose Doppelmayr's use of other steel suppliers or to contend that Doppelmayr or Flatiron Parson Joint Venture has not fulfilled its DBE obligations as it relates to steel purchases for the OAC project. DPI contends that the Settlement Agreement was illegal because it had the effect of defeating or impairing the objectives of federal DBE regulations."

On September 19, 2014, the court denied the new trial motion, explaining, inter alia: "DPI's arguments about the illegality of the Settlement Agreement were made at trial and are not persuasive. DPI's arguments assume that if one party in a business dispute claims violations of laws or regulations intended to benefit that party, any settlement of that dispute is unenforceable as a violation of public policy because the other party was thereby attempting to circumvent the public policies on which those laws

---

[8] The court also awarded Doppelmayr its attorney fees and costs as the prevailing party, with the amount of fees to be determined by noticed motion. In a related appeal, DPI has challenged the court's subsequent attorney fees award, a claim we will address in a separate opinion. (*DCCCA1, Inc. v. Diversified Product Industries, Ltd.* (A144196) [nonpub. opn.].)

and regulations were based. This argument is not supported by authority or logic. A contract is only illegal if it has an illegal purpose. To support its claim that the Settlement Agreement is contrary to public policy, DPI was required to show that the contract, not Doppelmayr's conduct prior to entering into the contract, injured the interests of the public as a whole or contravened some established interest of society. [Citation.] DPI did not make that showing at trial.

"[¶] The DBE requirements were intended to help companies like DPI obtain construction contracts. DPI obtained such a construction contract and supplied steel in connection with its performance under the contract. A dispute arose and DPI contended that Doppelmayr breached its contract and was not in compliance with its obligations under DBE regulations. DPI, the beneficiary of the DBE regulations, then agreed to resolve its dispute and waive its claims for violation of DBE requirements. There is a strong public policy in favor of settlement of disputes. DPI's contention that a construction company, represented by counsel, can negotiate a settlement of its contractual and DBE-based claims and then freely breach the settlement agreement if it decides later that its DBE claims had merit, is not supported by any case law. Under DPI's approach, no settlement of claims arising from a claim that a statute or regulation has been violated would be enforceable. Indeed, under DPI's suggested approach, any written settlement in this case would be unenforceable if DPI chose to later claim that Doppelmayr's conduct violated DBE regulations. The policy in favor of facilitating DBE participation in construction projects does not require the court to protect DBE's from their own settlement agreements, and is clearly outweighed in this case by the policy favoring enforceability of freely negotiated commercial agreements. For that reason, the court is not persuaded that its ruling about the legality and lawful purpose of the Settlement Agreement was incorrect, and DPI's evidence regarding DBE violations prior to the execution of the Settlement Agreement is not a basis to grant a new trial."[9]

---

[9] In rejecting DPI's challenges to the court's finding in its statement of decision that DPI was not terminated or substituted as a DBE, the court not only found that its

7

On October 1, 2014, DPI filed a notice of appeal.

Thereafter, DPI's attorney, George Wolff, sent a letter to a number of government officials and to BART, accusing Doppelmayr of false reporting of DBE participation rates on the OAC project. When Doppelmayr demanded that Wolff retract the letter because it violated the settlement agreement and the judgment enforcing the agreement, Wolff declined do so, stating that the appeal "likely" stayed enforcement of the judgment and that he had written the letter on his own, not on DPI's behalf.

Doppelmayr then asked the trial court to hold DPI in contempt for violating the judgment, based on Wolff's letter. DPI, for its part, requested a stay of enforcement of the settlement agreement pending resolution of the appeal.

On December 18, 2014, the court denied DPI's request to stay the proceedings, rejecting DPI's contention that the order for specific performance of the settlement agreement was a mandatory injunction. Instead the court found that the order was a prohibitory injunction, given that it did not require DPI to engage in any affirmative acts that changed the status quo.

As to Doppelmayr's request that the court hold DPI in contempt, the court found that its order for specific performance was "not explicit enough to support a finding of contempt based on a claim by DPI's attorney that does not purport to be a claim made by DPI." The court further stated that its judgment had included a finding that the settlement agreement was enforceable and had enjoined DPI from seeking further payments related to the steel it sold to Doppelmayr for the OAC project. However, although the court had ordered DPI to perform under the settlement agreement, it "did not specifically enjoin DPI from making claims to government entities that Doppelmayr had violated state and federal laws by making false claims within the meaning of the California and federal civil and criminal False Claims Acts. Although the Settlement Agreement includes DPI's

findings were not contrary to the evidence, but also emphasized that "[t]he primary basis for the court's ruling was the fact that DPI *agreed* that Doppelmayr had fulfilled its obligation to purchase steel from DPI." (Italics added.)

agreement that it would 'not contest or oppose Doppelmayr's use of other steel suppliers in any matter,' " including any argument that Doppelmayr and/or Flatiron/Parsons had not fulfilled their DBE " 'obligations with regard to steel purchases for the OAC Project,' the court's ruling did not specifically enjoin any particular conduct in this regard. In addition, as DPI contends, there are public policy implications with regard to reporting crimes that were not expressly raised by the parties or addressed by the court in the order specifically enforcing the Settlement Agreement. Thus, the letter sent by Mr. Wolff may support a claim by Doppelmayr that DPI has breached the Settlement Agreement, and could support a claim for monetary damages, but the court's order is not specific enough to find that contempt is an appropriate remedy for breaches of the Settlement Agreement other than claims for additional recovery by DPI."

## DISCUSSION

### *The Settlement Agreement Does Not Violate*
### *State or Federal Law or Public Policy*

DPI's primary contention on appeal is that the settlement agreement is void and unenforceable because it violates public policy.

There is a strong public policy favoring the settlement of disputes, and a settlement agreement is therefore "considered presumptively valid." (*Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 930.) Settlement agreements are contracts and are subject to the same general principles governing all contracts, including the principle that courts seek to interpret them as lawful and operative without violating the parties' intent. (*Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 746 (*Kaufman*).) " 'The question whether a contract violates public policy necessarily involves a degree of subjectivity. Therefore, ". . . courts have been cautious in blithely applying public policy reasons to nullify otherwise enforceable contracts." ' " (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 183–184 (*Dunkin*).) Accordingly, " ' "unless it is entirely plain that a contract is violative of sound public policy, a court will never so declare. 'The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power,

9

and . . . should be exercised only in cases free from doubt.' " ' [Citation.]" (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 777, fn. 53.)

Nevertheless, "[w]hen the policy of [a] statute or rule outweighs the interest in enforcement of the contract term, a court will not assist in giving effect to the offending term." (*Cariveau v. Halferty* (2000) 83 Cal.App.4th 126, 132 (*Cariveau*); see also cf., Civ. Code, §§ 1550, subd. (3), 1596, 1598 [a contract must have a lawful object or it is void]; Civ. Code, § 1667 [defining unlawful contracts as those that are contrary to "an express provision of the law . . . [or] [c]ontrary to the policy of express law, though not expressly prohibited; or [o]therwise contrary to good morals"]; Rest.2d Contracts, § 178 [discussing public policy factors weighing in favor of and against a contract's enforcement].)[10]

A party seeking to avoid enforcement of a contract has the burden " ' " 'to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people' [Citation.]" ' [Citations.]" (*Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832, 839 (*Bovard* ).) " 'Whether a contract is illegal or contrary to public policy is a question of law to be determined from the circumstances of each particular case.' [Citation.]" (*Dunkin*, *supra*, 82 Cal.App.4th at p. 183, citing *Bovard*, at p. 840.)

The DBE program is based on " 'the policy of the United States that small business concerns, [and] small business concerns owned and controlled by socially and economically disadvantaged individuals, . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency.' " (*Adarand Constructors, Inc. v. Pena* (1995) 515 U.S. 200, 206, quoting 15 U.S.C. § 637, subd. (d)(1).) In furtherance of this policy, the Small Business Act "establishes 'the

---

[10] The Restatement Second of Contracts, section 178, subdivision (1) provides in relevant part: "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."

10

Government-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals' at 'not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.' [Citation.] It also requires the head of each federal agency to set agency-specific goals for participation by businesses controlled by socially and economically disadvantaged individuals. [Citation.]" (*Adarand Constructors*, *Inc.*, at p. 206, quoting 15 U.S.C. § 644, subd. (g)(1).)

The Department of Transportation (DOT) regulations spell out the requirements for DBE participation in its financial assistance programs. The objectives of those regulations include, inter alia, "[t]o ensure nondiscrimination in the award and administration of DOT-assisted contracts" (49 C.F.R. 26.1(a)), "[t]o create a level playing field on which DBEs can compete fairly for DOT-assisted contracts" (49 C.F.R. 26.1(b)), "[t]o help remove barriers to the participation of DBEs in DOT-assisted contracts (49 C.F.R. 26.1(e)), and "[t]o promote the use of DBEs in all types of federally-assisted contracts and procurement activities conducted by recipients." (49 C.F.R. 26.1(f).)

DPI devotes a great deal of its opening brief to discussing the DBE regulations and the ways in which it believes that Doppelmayr violated them in its pre-settlement treatment of DPI. The trial court found that DPI's claim that the settlement money it received from Doppelmayr was intended as " 'hush money' " to keep it from reporting Doppelmayr's violation of DBE regulations directly contradicted "DPI's express acknowledgment in the Settlement Agreement that Doppelmayr had fulfilled its obligation to purchase steel from DPI, [which] necessarily includes an acknowledgement that the DBE participation goal was met." The trial court also found that DPI did not demonstrate that it had entered into the agreement due to coercion/duress or mistake, and those findings have not been challenged on appeal.[11]

---

[11] In its reply brief, DPI acknowledges that it is not contesting the trial court's resolution of the economic duress and mistake issues, although it then asserts that those very facts support its argument that the remedy of specific performance was not warranted.

In light of the court's unchallenged finding that DPI was not coerced to enter into the settlement agreement, we agree that DPI is estopped from claiming that it was improperly terminated or substituted as a DBE, particularly since, as the court stated, "[u]nder DPI's approach, no settlement of claims arising from a claim that a statute or regulation has been violated would be enforceable. Indeed, under DPI's suggested approach, any written settlement in this case would be unenforceable if DPI chose to later claim that Doppelmayr's conduct violated DBE regulations."[12] This conclusion does not, as DPI argues, allow Doppelmayr to violate public policy by evading the regulations applicable to DBE compliance. Rather, it affirms the validity of the agreement between these two parties, both of which were represented by counsel, to settle the dispute between them for their mutual benefit. (See *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.*, *supra*, 50 Cal.4th at p. 930 [discussing strong public policy favoring settlement of disputes].) The settlement provided DPI with an additional markup of between 5 and 5.5 percent on the steel it purchased for Doppelmayr, in exchange for DPI's release of claims against Doppelmayr. This was a reasonable resolution of the dispute, and, as we shall further discuss, *post*, DPI has not shown that the agreement improperly permitted Doppelmayr to thwart enforcement of DBE regulations. (Compare *Cariveau*, *supra*, 83 Cal.App.4th at p. 128 [refusing, on public policy grounds, to enforce settlement agreement's confidentiality clause, which prohibited customer in a securities transaction from discussing selling agent's misconduct with regulatory authorities].)

DPI further claims that even if the settlement agreement precludes it from challenging whether Doppelmayr's actions violated DBE regulations for purposes of

---

[12] The court then found that even if DPI were not estopped from claiming that it was improperly terminated or substituted as a DBE, the evidence showed that the claim lacked merit. We need not address the merits of this issue on appeal since we have concluded the court was correct in finding that DPI is estopped from making such a claim after entering into a settlement agreement that resolved the dispute between the parties as to this precise issue.

12

obtaining additional money or work from Doppelmayr, the agreement nevertheless violated public policy because it prohibited DPI from reporting crimes or other violations of law to the government. The trial court, however, in refusing Doppelmayr's request for a contempt finding, based on Wolff's letter to various authorities about Doppelmayr's alleged violations of law, specifically found that the terms of the settlement agreement involved only DPI's claims for additional money or reinstatement, or its opposition to Doppelmayr's use of other steel suppliers. The court agreed with DPI's counsel that the settlement agreement did not prohibit the reporting of an alleged crime, which would violate public policy. Doppelmayr's counsel agreed that the settlement agreement did not prohibit DPI from reporting a crime, but he did argue for a more restrictive reading of the agreement, i.e., as prohibiting DPI from making any claims whatsoever regarding Doppelmayr's alleged violation of DBE requirements. On appeal, Doppelmayr does not challenge the court's findings that the settlement agreement did not prohibit DPI from reporting such alleged violations to government authorities.[13]

Like the trial court, we do not read the settlement agreement as precluding DPI from reporting alleged crimes or other violations of law to the appropriate authorities.

---

[13] Indeed, Doppelmayr asserts that DPI is judicially estopped from making the argument on appeal that the settlement agreement is void because it violates public policy since it prevailed in the trial court on the conflicting argument that the settlement agreement did not preclude it from reporting Doppelmayr's crimes or other violations of law. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183 [" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding' "].) It is true that the court found in DPI's favor on this issue when, postjudgment, it refused to hold DPI in contempt for attorney Wolff's letter to public officials regarding Doppelmayr's alleged DBE violations. But DPI's argument there was that the letter did not violate the court's order because the judgment was stayed pending appeal, not that the settlement agreement otherwise permitted such conduct. Moreover, the trial court did not definitively determine that Wolff's letter would preclude Doppelmayr from claiming that DPI had breached the settlement agreement; it simply found that contempt was not appropriate both because the letter was from Wolff, not DPI, and the court had not specifically addressed the public policy implications of reporting crimes in its prior orders. Judicial estoppel is not applicable in these circumstances. (See *ibid.*)

13

Such an interpretation would in effect permit Doppelmayr to impose a gag order on DPI, requiring it to conceal alleged wrongdoing, for which there could be no policy justification.

Looking at the challenged terms of the settlement agreement, in the "Consideration" section, the parties "recognize[d] that Doppelmayr has no obligation to place any future steel orders with DPI for or relating to the OAC Project beyond or in addition to those amounts already ordered as of the date of this Settlement Agreement, and DPI shall not contest or oppose Doppelmayr's use of other steel suppliers in any matter, including but not limited [to] any argument or contention that Doppelmayr and or [Flatiron/Parsons] has or have not fulfilled their Disadvantaged Business Enterprise obligations as it relates to steel purchases for the OAC Project." In the "Mutual Release and Waiver of Unknown [] Claims" section of the agreement, DPI agreed to release Doppelmayr and Flatiron/Parsons "from any and all claims, demands, debts of any kind or character whatsoever, whether known or unknown, suspected or unsuspected, whether currently existing or arising in the future, arising out of or relating to the Dispute . . . ; nor shall DPI assert any claim arising out of or related to the Dispute with and/or against BART." The confidentiality provision of the agreement precludes the parties from disclosing confidential information, which includes the content of settlement negotiations, the terms of the settlement, or any monetary consideration provided under the agreement, unless "required by law, contract, or tax requirements."

These challenged provisions are all part of an agreement that was intended to finally settle the markup dispute between the parties. The first two provisions at issue boil down to DPI agreeing that it would not demand additional payment or seek additional involvement in the OAC project—whether by claiming additional money was due or by claiming that Doppelmayr had not satisfied its DBE obligations—through claims directly against Doppelmayr or Flatiron/Parsons, or through claims with or against BART. The confidentiality provision, by its terms, only precludes DPI from disclosing the content of settlement negotiations and the terms of the settlement, including money it received. It does not prohibit DPI from disclosing any of the pre-settlement conduct of

14

the parties and certainly does not purport to prohibit DPI from reporting illegal conduct on the part of Doppelmayr or anyone else. (See *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1082 [confidentiality clause did not violate public policy where it did not require parties to withhold evidence or violate a duty to disclose]; compare, e.g., *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.* (5th Cir. 1987) 821 F.2d 1085, 1090 [holding that "an employer and an employee cannot agree to deny to the EEOC [Equal Employment Opportunity Commission] the information it needs to advance [the] public interest [in preventing employment discrimination]. A waiver of the right to file a charge [with the EEOC] is void as against public policy"].)[14]

In short, all of the challenged settlement terms can reasonably be read to restrict DPI solely from raising claims related to its acquisition and provision of steel for the OAC project and the payment it received from Doppelmayr for its services, since DPI released all such claims as part of its agreement to settle the dispute. (See *Kaufman*, *supra*, 195 Cal.App.4th at p. 746 [courts seek to interpret settlement agreements as lawful and operative without violating parties' intent]; see also *City of Santa Barbara v. Superior Court*, *supra*, 41 Cal.4th at p. 777, fn. 53 [" ' " 'The power of the courts to declare a contract void for being in contravention of sound public policy . . . should be exercised only in cases free from doubt.' " ' "].) This was a reasonable resolution of the parties' dispute and did not violate public policy.

---

[14] The various postsettlement communications sent by DPI and/or attorney Wolff to BART and other public entities demonstrate this distinction. In the initial claims, including DPI's letter to BART requesting that BART allow it to furnish all of the steel required for the OAC project, the stop payment notices sent to BART claiming that it was still owed nearly $2,000,000, and the surety bond claim sent to Flatiron/Parsons' surety insurer, DPI was making claims for additional payment or involvement in the project, which had been fully resolved in the settlement agreement. On the other hand, the subsequent letter from Wolff to various government officials, including a BART official, reported Doppelmayr's alleged submission of false claims to BART on the OAC project based on its false reporting of DBE participation rates. In that letter, Wolff did not make any claims on behalf of DPI that had been resolved in the settlement agreement.

This case is thus distinguishable from *Cariveau*, *supra*, 83 Cal.App.4th at page 128, relied on by DPI, in which the trial court had refused, on public policy grounds, to enforce a settlement agreement's confidentiality clause that expressly "prohibited the customer in a securities transaction from discussing the selling agent's misconduct with regulatory authorities." In affirming the trial court's ruling, the appellate court identified numerous statutory provisions and security industry rules that were violated by the confidentiality clause. (*Id.* at pp. 133-134.) The confidentiality clause in *Cariveau* also had the effect of allowing the agent to continue violating the applicable securities rules. (*Id.* at p. 137.) The appellate court concluded that "[t]he public policy express and implied from securities laws and regulations outweighs the general interest in settling disputes without litigation. To permit [agents'] violations of rules and shield them from administrative review in an agreement to silence wrongdoing would undermine the public's confidence in the integrity of securities oversight." (*Ibid.*)

As discussed, *ante*, the terms of the settlement agreement in the present case, unlike the problematic provision in *Cariveau*, did *not* prohibit DPI from reporting any perceived regulatory violations to regulatory and other authorities, and thus did not shield Doppelmayr from any official investigation into whether it fulfilled its DBE obligations. The agreement merely requires DPI to abide by the terms of the settlement and to refrain from attempting to revisit the disputes between the parties that was resolved therein. (See *Kaufman*, *supra*, 195 Cal.App.4th at p. 746 [time to raise concern about fairness of settlement agreement is when settlement is negotiated, not after party has enjoyed benefit of bargain].)

In conclusion, because DPI did not satisfy its burden of showing that enforcement of the settlement agreement in the circumstances of this case would violate the settled public policy of this state, the trial court correctly found that the entire agreement is

enforceable.  (See *Dunkin*, *supra*, 82 Cal.App.4th at p. 183; *Bovard*, *supra*, 201 Cal.App.3d at p. 839.)[15]

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to respondent, DCCCA1, Inc.

_____

[15] Given this conclusion, we necessarily find meritless DPI's related contentions that the settlement agreement, as well as Doppelmayr's postsettlement conduct, violated a number of distinct public policies, including those in federal DBE regulations, whistleblower policies in state and federal False Claims Acts, laws and policies prohibiting concealment of crimes and obstruction of justice, and policies expressed in other laws.  As discussed, *ante*, nothing in the settlement agreement precludes DPI from reporting any alleged criminal conduct or other perceived violations of law to state or federal agencies.  We likewise reject DPI's contention that the judgment is, "by means of a vague and uncertain injunction," a prior restraint on DPI's "[First] Amendment rights and duty to report frauds on and crimes against the Government."

Finally, we find that DPI has forfeited its argument that the remedy of specific performance was unwarranted under the evidence.  Although, in its opening brief, it cites several cases and statutes that discuss specific performance, it does not provide more than a cursory argument in support of its claim.  (See *Kaufman*, *supra*, 195 Cal.App.4th at p. 743 ["Every argument presented by an appellant must be supported by both coherent argument and pertinent legal authority"].)  DPI merely states that "the statement of decision does not show that any of the elements of or preconditions to specific performance were proven by any evidence at trial, and thus fails to support entry of judgment."  DPI then states that it signed the settlement agreement due to economic duress and mistake, and concludes that the specific performance order was not just and reasonable.  Because these conclusory statements do not constitute "coherent argument," the issue is forfeited.  (See *ibid.*)

17

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.

18